UNITED STATES of America, Appellee,

v.

Frances Louise EDDY, Appellant.

UNITED STATES of America, Appellee,

v.

Paul Matthew BONANNO, Appellant.

Nos. 76–2375, 76–2338.

United States Court of Appeals,
Ninth Circuit.

Dec. 22, 1976.

Peter B. Clarke, of Deutsch, Parziale & McCabe, San Diego, Cal., for appellant in No. 76–2375.

Anthony S. Deutsch, of Deutsch, Parziale & McCabe, San Diego, Cal., for appellant in No. 76–2338.

Daniel K. Green, Asst. U. S. Atty., on the brief, Terry J. Knoepp, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before GOODWIN and WALLACE, Circuit Judges, and INGRAM,* District Judge.

GOODWIN, Circuit Judge:

Paul Bonanno and Frances Eddy appeal their convictions for conspiracy to violate the Controlled Substance Act[1] and for unlawful distribution of methamphetamine

---

* The Honorable William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

1. 21 U.S.C. § 801 et seq.

powder. Bonanno also appeals from a related conviction for unlawful possession of a firearm during the commission of a felony.[2]

Both defendants challenge the sufficiency of the evidence. They contend further that the indictment was defective because the Attorney General failed to adhere to the republication requirement of 21 U.S.C. § 812(a). Finally, Eddy argues that she was arrested without probable cause and that the failure of the government to furnish copies of certain postarrest statements violated Fed.R.Crim.P. 16(a) and prejudiced her sufficiently to require a new trial.

The convictions stemmed from the efforts of Gary Gleason, an undercover agent, to buy methamphetamine powder on two occasions. The distribution counts stemmed from the first and the conspiracy counts from the second.

The first buy was made on December 10, 1975. Gleason met Camelia Ann Lynn and her husband Richard Lynn in Room 60 of the Saratoga Hotel in San Diego, and arranged with them to buy an ounce of methamphetamine powder. He drove them to an intersection in San Diego where Mrs. Lynn left the car, saying that she was going to talk to her connection. Mrs. Lynn went to the apartment in which Bonanno and Eddy were living, told them of Gleason's request, and was told that they could get an ounce of speed. Bonanno then left the apartment, went outside, and looked carefully for several minutes at all the vehicles passing on the street. He was observed by Joseph Dorsey, a plainclothed policeman.

When Mrs. Lynn returned to the car she told Gleason that her source, whose name was Fran, was nervous. She told him to wait, and left again. Soon, Bonanno and another man approached the car and began whispering with Mr. Lynn, who had been waiting with Gleason. Lynn said later that Bonanno was checking out Gleason to see if he was "cool".

Mrs. Lynn returned shortly with about one quarter of an ounce of methampheta-mine powder. She told Gleason she would have to get the remaining three quarters of an ounce from the laboratory and that he should return to the Saratoga to wait for word. He paid her $250, and left with Mr. Lynn. Mrs. Lynn went to the bank with Eddy, changed the bills for others of different denominations, and gave the money to Eddy.

The remainder of the methamphetamine was delivered later that day. Gleason returned with Mr. Lynn to the same intersection. Mr. Lynn left the car and soon returned with a bag of methamphetamine. Gleason gave him $650 and Mr. Lynn left again, returning this time with Mrs. Lynn and a final bag of methamphetamine powder. At trial, Mrs. Lynn testified that she received the first portion of the methamphetamine from Eddy and the last portion from Bonanno.

The second buy was negotiated and was to have occurred on January 12, 1976. As before, Gleason met the Lynns at Room 60 of the Saratoga. The Lynns agreed to arrange the sale of one-half pound of methamphetamine for $5,600. During this conversation the Lynns referred to their connections as "Paul" and "Fran". A discussion of delivery logistics ensued, during which Mrs. Lynn left the room to confer with Paul and Fran. It was agreed that the transaction would be consummated, using the Lynns as intermediaries, at a parking lot some distance away, and Gleason gave Mrs. Lynn a marked ten-dollar bill for cab fare for Paul and Fran, who did not want to meet him or ride with him.

Gleason and the Lynns drove to the parking lot in Gleason's car. When they arrived, Mrs. Lynn asked for the money, indicating that she would return with the drug. At this point, Gleason gave the arrest signal and arrested both Lynns.

About five minutes after Gleason left the Saratoga, Eddy and Bonanno, under surveillance by Dorsey, left the hotel and got in a taxi. The taxi let them out one block from the parking lot. As they were walk-

---

**2.** A violation of 18 U.S.C. § 924(c)(2).

ing toward it, Dorsey arrested them. After the arrest a loaded, stockless, semi-automatic shotgun was discovered concealed on Bonanno's person and the marked ten-dollar bill was recovered from Eddy's purse. Records of the Saratoga Hotel indicated that Room 54 was rented by Paul Bonanno.

## I. SUFFICIENCY OF THE EVIDENCE

Once the existence of a conspiracy has been established, only slight evidence is required to connect a defendant with it. *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969). Here there is substantial evidence of a conspiracy to sell methamphetamine through a distribution chain from "the laboratory" through "Paul and Fran" to the Lynns. Bonanno and Eddy assert that the evidence does not allow an inference that they were the Paul and Fran in question.

Apart from Mrs. Lynn's identification of them, and apart from the other evidence of the second buy, testimony indicated that Paul Bonanno and Frances Eddy were Mrs. Lynn's connection. A room was registered to Bonanno in the Saratoga Hotel and the two were in the hotel when the negotiations for the second buy were being conducted. The ten dollars Mrs. Lynn said she was giving her connection for cab fare was discovered in Eddy's purse. Bonanno and Eddy had traveled almost to the rendezvous point from the Saratoga, and Bonanno was carrying a concealed, loaded shotgun when they were arrested. This collocation of circumstances is more than adequate to link the defendants to the established conspiracy. Because the evidence supports Bonanno's conspiracy conviction, we also hold that there was sufficient evidence of the commission of a felony to affirm Bonanno's conviction on the firearms charge.

Bonanno and Eddy also claim that the evidence supporting the distribution counts is insufficient. These counts stemmed from the second buy, on December 11, the day that Mrs. Lynn testified she received methamphetamine from both Bonanno and Eddy. The defendants would have us disregard this testimony because of contradictions within it. The able trial judge was asked to find that Mrs. Lynn's testimony was inherently incredible as a matter of law. He refused, and defendants have pointed to no abuse of discretion in this ruling. The jury evidently believed her testimony. It was enough to convict Bonanno and Eddy.

Finally, Eddy claims there was insufficient evidence that the substance seized was methamphetamine as prohibited by 21 U.S.C. § 812(c), Schedule II, because there was no evidence that it contained a sufficient quantity of the drug to have a measurable physiological effect. She cites no supporting cases, and we have found none. The statute contains no "minimum amount" qualification and we are unwilling to imply one here. *See United States v. Nelson*, 499 F.2d 965, 966 (8th Cir. 1974). *See also Jordan v. United States*, 416 F.2d 338 (9th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 930, 25 L.Ed.2d 101 (1970).

## II. REPUBLICATION REQUIREMENT OF 21 U.S.C. § 812(a)

The defendants argue that the Attorney General failed to republish Schedule II as required by 21 U.S.C. § 812(a). As a consequence of this failure, they argue that the substances listed on Schedule II, including methamphetamine, have ceased to be controlled substances, so the indictment under which the defendants were charged failed to state an offense.

Two district judges in this circuit have recently considered this argument with respect to other drugs, and both have rejected it. *United States v. Andrews*, 408 F.Supp. 1007 (N.D.Cal.1976); *United States v. Monroe*, 408 F.Supp. 270 (N.D.Cal.1976). We concur in this result, but reach it by a different route.[3]

---

3. Our approach is suggested in *United States v. Andrews*, 408 F.Supp. 1007, 1009 n. 3 (N.D.Cal. 1976).

Section 812(a) of 21 U.S.C. appears in the margin.[4] It provides for five schedules of controlled substances to be updated and republished by the Attorney General, initially on a semiannual basis and then annually. Section 812(b) defines the required characteristics for each schedule and section 812(c) designates the initial composition of each schedule. The defendant's argument relies heavily on 21 U.S.C. § 811(a), which prescribes the procedures to be followed by the Attorney General in amending the schedules.[5] It explicitly mandates the use of the rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, including publication in the Federal Register of any changes in the schedules.

Updated schedules of controlled substances were published in the Federal Register on four occasions, most recently on June 20, 1974.[6] They were also republished annually in the Code of Federal Regulations, beginning in 1972.[7]

Bonanno and Eddy impute the notice requirements of § 811(a) to the chapter as a whole, including § 812(a). They argue that the command of § 812(a) that the schedules "be updated and republished on an annual basis" requires publication in the Federal Register. We find no basis for this contention in either the statutory scheme or the legislative history and hold that the republication requirement of § 812(a) is satisfied by annual publication of the updated schedules in the Code of Federal Regulations.

Section 811 delegates to the Attorney General the authority to promulgate regulations making the unauthorized possession and distribution of certain substances illegal. Because of the serious consequences of such regulations for those who might be unaware of them, Congress has specifically invoked the protections of the Administrative Procedure Act, one of which is the requirement of publication in the Federal Register. This publication requirement is explicitly mentioned in the legislative histo-

---

**4.** "§ 812(a). There are established five schedules of controlled substances, to be known as schedules I, II, III, IV, and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semi-annual basis during the two-year period beginning one year after the date of enactment of this subchapter and shall be updated and republished on an annual basis thereafter."

**5.** "§ 811(a). The Attorney General shall apply the provisions of this subchapter to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedules under this subchapter.

Except as provided in subsections (d) and (e) of this section, the Attorney General may by rule—

(1) add to such a schedule or transfer between such schedules any drug or other substance if he—

(A) finds that such drug or other substance has a potential for abuse, and

(B) makes with respect to such drug or other substance the findings prescribed by subsection (b) of section 812 of this title for the schedule in which such drug is to be placed; or

(2) remove any drug or other substance from the schedules if he finds that the drug or other substance does not meet the requirements for inclusion in any schedule.

"Rules of the Attorney General under this subsection shall be made on the record after opportunity for a hearing pursuant to the rule-making procedures prescribed by subchapter II of chapter 5 of Title 5. Proceedings for the issuance, amendment, or repeal of such rules may be initiated by the Attorney General (1) on his own motion, (2) at the request of the Secretary, or (3) on the petition of any interested party."

**6.** 37 Fed.Reg. 9545 (May 12, 1972); 38 Fed.Reg. 953 (Jan. 8, 1973); 38 Fed.Reg. 8254 (March 30, 1973); 39 Fed.Reg. 22140 (June 20, 1974). The March 30 republication was apparently issued to remedy some defects in that of January 8. The designee of the Attorney General who effected these republications stated in them that he did so to comply with the mandate of § 812(a). The determination that they were necessary was evidently reconsidered and reversed when he decided to cease republication in the Federal Register. We think his latter determination was the correct one.

**7.** See 21 C.F.R. § 308 for 1972 and 1973, and 21 C.F.R. § 1308 for 1974 and 1975.

ry with respect to amending the schedules under § 811(a).[8]

Section 812 delegates no authority to change existing laws or regulations that is relevant here.[9] When read in conjunction with § 811, the updating and republication requirement of § 812(a) expresses a desire on the part of Congress to maintain an accessible, up-to-date set of schedules. The requirement is not intended to provide notice of acts which would be criminal, as defendants contend. That function is performed by the publication requirements of § 811(a). Nor is it intended to require that the Attorney General resort to the procedures of § 811 to reevaluate the status of each controlled substance every year. Section 811(a) provides for reevaluation at any time upon petition of the Attorney General, the Secretary of Health, Education and Welfare, or any interested party. Section 812 requires simply that the changes made in the schedules and published in the Federal Register over the course of the year be compiled and incorporated into the existing schedules. The legislative history of § 812 makes no mention of the Federal Register and justifies no inference that republication must occur therein. We cannot say that annual updating and republication in the Code of Federal Regulations does not satisfy the mandate of § 812(a).[10]

## III. EDDY'S ARREST

■ Defendant Eddy argues that there was no probable cause for her arrest. We have reviewed the evidence, and hold that the arresting officer, Dorsey, did have probable cause. He knew that "Paul" and "Fran" would travel from the Saratoga to the rendezvous point for the second buy. He saw Bonanno, whom he recognized from the December 10 buy, leave the Saratoga with a female and take a cab to a point one block from the rendezvous site. He thus had reason to believe that the woman with Paul Bonanno was "Fran", one of the Lynns' connections.

## IV. EDDY'S STATEMENTS

■ Eddy's final contention is that the failure of the government to provide copies of two statements she made shortly after her arrest was a violation of Fed.R.Crim.P. 16 and the order of the trial court and was sufficiently prejudicial to require a new trial. While the failure of the government to comply with discovery orders is a serious matter, it does not compel retrial under the circumstances of this case. There is no allegation of prosecutorial bad faith. The statements were not exculpatory and so do not come within the rule of Brady v. Maryland, 373 U.S. 83 (1963). Testimony about both of her statements came from Gleason; Eddy's own attorney brought one to light; the prosecutor brought out the other. Eddy claims she was prejudiced in that she was deterred from testifying because "she felt she could not explain the surprise statements."

Eddy misconceives the nature of the prejudice required for reversal here. That the statements themselves damaged her case and kept her from testifying is immaterial. Eddy must show that the failure of the government to reveal this evidence to the defense prejudiced her. She makes no such allegation, and there is no evidence that she was prejudiced by the failure. There were several recesses after Gleason testified, and at no time did her counsel request additional time to prepare. The district judge, hearing the statements at trial, found that they were not prejudicial and did not require a new trial. We find no error in this determination.

The convictions are affirmed.

---

**8.** H.R.Rep.No.1444, 91st Cong., 2nd Sess., 1970 U.S.Code Cong. & Adm.News pp. 4566, 4569.

**9.** Section (d) of § 812 does authorize the Attorney General to exempt substances which would otherwise be controlled if they meet certain criteria. The section requires all such exemptions to be by regulation, i. e., subject to the rulemaking provisions of the Administrative Procedure Act.

**10.** See United States v. Grummel, Jr., 542 F.2d 789 (9th Cir. 1976).