UNITED STATES

v.

Patrick J. TORRENCE, Seaman Apprentice, U.S. Coast Guard.

CGCMS 23332.
Docket No. 807.

U. S. Coast Guard Court of Military Review.

5 July 1977.

Trial Counsel: LT Michael J. Perrone, USCGR.

Defense Counsel: LT William K. Bissell, USCG.

Appellate Defense Counsel: LT Patricia L. Shebest, USCGR.

For the United States: LT Malcolm J. Williams, Jr., USCGR.

## OPINION OF THE COURT

ROSENWASSER, Chief Judge:

A military judge sitting as a special court-martial convicted the accused, after pleas of not guilty, of four offenses: possessing cocaine aboard the Coast Guard Cutter GLACIER; wrongful appropriation of a government van at the San Diego Coast Guard Air Station; drunken driving, and reckless driving. The accused requested a sentence of bad conduct discharge with no other punishment, and the judge imposed the sentence asked for. Reviewing authorities below have approved the findings of guilty and sentence.

Errors assigned question the sufficiency of the evidence to support all but the drunken driving conviction. We find that only one of the findings of guilty—the reckless driving conviction—must be set aside.

With regard to the cocaine possession charge, appellant asserts that prejudicial error was committed in the reception of opinion testimony identifying the substance

as cocaine, and further that the evidence as a whole "failed to establish beyond a reasonable doubt that the substance possessed by the defendant was cocaine."

No sample had been offered in evidence, nor was there any chemical analysis. The Government relied instead on the testimony of petty officers Whipple and Toney to establish the offense. Both of these witnesses were recipients of grants of immunity; both were accomplices of the accused; accordingly we have considered their testimony with due caution. Whipple's testimony was crucial on the question of the identity of the substance. The combined testimony of Whipple and Toney convincingly established that a portion of the questioned substance was delivered to the appellant.

Petty Officer Whipple testified that on the day of the offense he went from the ship into Callao, Peru, for the purpose of purchasing cocaine, and that he there met a street dealer with whom some days before, he had had an appointment for the purchase of cocaine. For the full four days the ship was in the port of Callao, Whipple was "pretty well loaded" on what he said was cocaine; he had been "doing anywhere from three to ten grams a day." On seven or eight previous occasions he had used what he said was cocaine. He described the feeling he got from sniffing cocaine. He bought two packets of the substance this day from this dealer. It was a white crystalline powder. He inhaled it before he bought it and found it "potent". Asked what effect it had on him, he replied:

> The numbing effect, euphoric feeling, general sense of well being, mellowed out, high.

Whipple paid $265 or $285 for one ounce of the substance, which he bought for himself, and he paid between $80 and $100 in Peruvian money for a smaller amount bought for Toney and the accused. He stated his opinion that the substance was cocaine.

■ It was neither error of law nor abuse of discretion for the trial judge to allow the witness to state the opinion. The witness disclosed sufficient apparent familiarity with cocaine to give probative value to his opinion, and there was an adequate foundation in the record for his expression of opinion. See *Ewing v. United States,* 386 F.2d 10, (CA 9, 1967) cert. den. 390 U.S. 991, 88 S.Ct. 1192, 19 L.Ed.2d 1299 (1968); *United States v. Jackson,* 49 C.M.R. 881 (A.F.C.M.R. 1975). At the trial, the defense counsel did not object to the question calling for the opinion, and properly so. An objection would go only to the weight of the opinion, not to its competence as evidence. It remained for the trial court first, and this court later, to give such credence to the opinion as the evidence and the record as a whole justified.

Whipple's opinion that the substance he bought in Callao on this day was cocaine, was reinforced by a number of circumstantial facts. These include:

1. the high price paid for the substance. Cf. *United States v. Quesada,* 512 F.2d 1043 (CA 5, 1975).
2. its purchase as cocaine. Cf. *United States v. Gregorio,* 497 F.2d 1253 (CA 4, 1974).
3. the physical appearance of the substance. Ibid.
4. the payment in cash. Ibid.
5. the lack of complaint on the part of purchasers. Ibid.
6. the secrecy and deviousness of the transaction. Ibid.
7. the sampling before purchase. Cf. *United States v. Agueci,* 310 F.2d 817 (CA 2, 1962).

■ In addition, we take judicial notice of the fact that Peru is a prime source of cocaine. Finally, we note that the defense counsel at the trial, in his final argument, conceded that what Whipple bought in Peru was "good cocaine". (He questioned whether the same was delivered to the accused.)

■ Weighing the evidence and judging the credibility of the witnesses anew, this court concludes that the substance possessed by the appellant was, beyond a reasonable doubt, cocaine.

The offense of reckless driving is declared by Article 111 UCMJ, 10 U.S.C. §

911, in a single sentence which, at the same time, proscribes the offense of drunken driving. Allegedly this accused committed both offenses after he drove a government van through the main gate into the San Diego Air Station and attempted to park it on an April night in 1976. There is no question that he was drunk. The reckless driving specification alleged that he operated the van

in a reckless manner by failing to negotiate a turn in attempting to park said van and thereby causing said van to strike and cause damage to a parked vehicle.

We assume, without deciding, that the specification is legally sufficient, although all it tells us about the manner of operation of the vehicle is that the driver failed "to negotiate a turn in attempting to park."

The only evidence to support the allegation of recklessness was testimony that the accused drove the van through the gate at approximately 11 p. m.; that he was drunk; that he went over a speed bump at "faster than a normal rate of speed"; that "he chose to park it right there close to the gate"; that he "just misjudged the distance into the parking area into the stall right next to it"; and that his right bumper hit the left rear of another parked car, breaking the tail light. The owner of the parked car estimated his damage at $45. In the testimony given, nothing was said about "failing to negotiate a turn".

■ The existence of simple negligence is enough to sustain a finding of guilty of negligent homicide. *United States v. Greenfeather,* 13 U.S.C.M.A. 151, 32 C.M.R. 151 (1962). It is not enough for reckless driving. Reckless driving involves "driving with such a high degree of negligence that if death were caused, the accused would have committed involuntary manslaughter, at least." Para. 190, MCM 1969. See also paragraph 198*b* of the Manual and compare with paragraph 213*f* (12).

The evidence adduced here is not sufficient as a matter of law to prove the culpable negligence required to establish the offense of reckless driving.

■ As for the offense of wrongful appropriation, we are satisfied that the evidence in the record amply supports the conclusion of the trial judge that the van had been taken and driven by the accused without authorization on other than government business.

The finding of guilty of Charge II, specification 2, alleging reckless driving, is set aside and the said specification is dismissed. The findings of guilty of the remaining three offenses are affirmed. Upon reassessment the sentence of a bad conduct discharge is approved.

Judges BRIDGMAN and BURGESS concur.

Judge YOUNG did not participate in the decision in this case.

MAGUIRE, Judge (concurring in part and dissenting in part):

My disagreement with the majority here is only with respect to the affirmance of the conviction on the specification and charge involving possession of cocaine. I concur with the dismissal of the reckless driving specification and the affirmance of the findings as to wrongful appropriation of the government vehicle and drunken driving. (I would of course accordingly adjust the sentence, but the "how" is unimportant.)

If it were not superfluous to what I consider fundamental here I would have to reflect more on the court's application of the seven tests seen to reinforce the witness Whipple's opinion that the substance was cocaine. For example, the high price paid I can see primarily as influential when a defendant himself claims that he thought he was purchasing birdseed rather than marijuana, and Whipple's asserted sampling of the substance before purchase I can see as a basis for allowing him to have an admissible opinion but not as "reinforcing," as by independent evidence, the validity of his opinion. The "test", I suspect, may be entirely circular, but it does not matter toward my conclusion.

The reason for dissenting on the narcotic substance matter is essentially the same—

inextricable linking of the Coast Guard Regulation to the schedules of controlled substances required under the Comprehensive Drug Abuse Prevention and Control Act of 1970, and the failure of the administrator of the Act to maintain schedules as required—as set forth with explanation in my dissent in *United States v. Wiles,* 3 M.J. 577 (C.G.C.M.R.1977). It is not the case that I should yield here to a "settled law" for the Coast Guard, for no satisfactory resolution has been reached on the question yet in the Federal criminal courts themselves, and I am forced to add to my comments in the "Wiles" case because of some "new matter" which illustrates the dangers attendant upon the cavalier treatment given the mandate of Congress by the administrator and some Federal courts.

In the "Wiles" decision this court cited two Federal court decisions in these words: "*United States v. Andrews,* D.C.[Cal.], 408 F.Supp. 1007 (1976). See also: *United States v. Eddy,* 549 F.2d 108 (9th Cir. 1976)." Despite the editorial addition to the identification of the "Eddy" opinion (at 3 M.J. 581, 584), the text of that decision had not yet been published and the holding of the Ninth Circuit was known only through its own reference to the "Eddy" case in the opinion of *United States v. Monroe,* 552 F.2d 860, CA 9, 1977 (cited by me at 3 M.J. 584, 587, but not by the majority), which was then available to be read. It is interesting that the editors do not consider the holding that reprinting in the CFR constitutes republication by the administrator worth even a headnote to this decision.)

The availability of the "Eddy" decision now makes consideration of its purported rationale necessary, because things are really more muddled than they had appeared.

A law review article would be appropriate for detailing a history of pseudo-supportive allusions to decided cases not quite in point or not quite saying what they are found to say, and there is no need to belabor the matter here but two items illustrative of alarming views in the history of this matter may be pointed out because the

"Eddy" decision bolsters itself by referring to them.

In *United States v. Mundt,* CA 10 (1976), 508 F.2d 904, the court exhibited impatience and amazement when a defendant would not accept docilely a declaration by the administrator of the Act that a required republication, made in the Federal Register on May 12, 1972, was effective as of April 27, 1972. It seems not to have occurred to the court that a defendant could hope that Clause 3 of Section 9, Article I of the Constitution, should inhibit administrators as well as Congress. Not quite as blatant is the summary disregard, in *United States v. Grummel,* CA 9 (1976), 542 F.2d 789, of the argument that an administrator who has failed to act in timely fashion under a schedule imposed by Congress has allowed his power to lapse and cannot revivify himself. The view opened by the court exposes a multitude of questions for the future as to duration of rules declared to be for a time certain and as to retroactivity of criminal law itself. The matters are irrelevant here because the Ninth Circuit alone has been confronted by the present issue and has far outstripped the constitutional issues previously in prospect.

Prescinding once again from questions of calendar duration and retroactivity (but understanding that earlier casual attitudes have shaped the response given), the issue is whether the administrator, by failing to republish schedules since the June 20, 1974, republication in the Federal Register at Volume 39, page 22141, has rendered the Act unenforceable. The "Eddy" decision and the circumstances attendant in the Ninth Circuit leave us, under full steam, at the edge.

A statement cardinal to the "Eddy" decision is found only in a footnote, and cryptic references to two district court decisions in other cases cause doubts and confusion.

In the "Wiles" case I noted that the two decisions spoken of by the majority, *United States v. Andrews,* D.C.N.D.Cal. (1976), 408 F.Supp. 1007, which was specifically followed as controlling and as shaping the majority's view, and the "Eddy" decision of

the Ninth Circuit, which includes California, were incompatible. The "Andrews" decision said that the "initial" schedules of the statute continued in full force and effect, with the "update and republish" provision of the statute reduced to a nothing, a mere slip of the Congressional tongue of no importance, while the "Eddy" opinion, as filtered through the brief "Monroe" discussion in the Ninth Circuit, apparently stood for an acknowledgment that the republication called for in the statute was indeed necessary but that the reprinting of schedules in the Code of Federal Regulations sufficed. I am not sure now that the resolution is that simple, since a reading of the "Eddy" opinion itself, at last, opens to dazzling vistas of strange law.

The court, in the "Eddy" opinion, took note of the disposition of both the "Andrews" and the "Monroe" cases at the district level, since both were in that circuit. *United States v. Andrews,* supra; *United States v. Monroe,* D.C.N.D.Cal. (1976), 408 F.Supp. 270. (No district court opinion in the "Eddy" case, tried earlier than the *Monroe* and the *Andrews* cases, seems to have issued.) The court of appeals declared that it concurred in the result of both cases (rather surprisingly since both were before it on appeal), but reached the result "by a different route." The opinion then goes on to say that its route was "suggested" by the "Andrews" decision. No mention was made of the "Monroe" opinion as a possible guide.

This may have been a graceful way of avoiding the embarrassment of recognizing that the *Monroe* decision at the district level embodied no "holding" at all (despite the digester's valiant effort to read in facts not in the record, at a headnote to the reported decision, *supra*). It is more likely, in view of the footnote mentioned and the apparent holding of the "Eddy" decision, an omen of worse to come.

The footnote, covering a matter of critical importance and concealing it, in a way, under a rug, reads as follows:

"The March 30 republication [of schedules] was apparently issued to remedy some defects in that of January 8 [1973].

The designee of the Attorney General who effected these republications stated in them that he did so to comply with the mandate of § 812(a). The determination that they were necessary was evidently reconsidered and reversed when he decided to cease republication in the Federal Register. We think his latter determination was the correct one." Footnote 6, 549 F.2d at 112.

(It is acknowledged immediately that in the text the court does say, "[We] hold that the republication requirement . . . is satisfied by annual [republication] . . . in the Code of Federal Regulations", but at this stage subtleties of potential refinement cannot be ruled out and a failure to analyze the meaning of this now cannot be excused.)

What the court does not say here in the footnote is as significant as what it does. It is worth recalling for the moment that there was no republication of any kind, (although we were still in the period of the "semiannuals" under the statute) from the correction of March 30, 1973, to the issuance of June 20, 1974 ("for 1974"), at 39 F.R. 22141. The court in harking back to the early-1973 issuances is recognizing the administrator's acknowledgment, repeated explicitly and implicitly several times, that the statute directed and required republication of the schedules on a timetable that was reducible to dates certain. (It was so reduced in *United States v. Nocar,* CA 7 (1974), 497 F.2d 719, and *United States v. Infelice,* CA 7 (1974), 506 F.2d 1358, to the disadvantage of the appellant on both occasions. It was recognized as so reducible in *United States v. Mundt,* supra, although slapdash compliance was tolerated and oddly imprecise language was used by the court.)

Scrutiny of the court's chosen expressions here, coupled with its deference to the "direction" it received from the "Andrews" decision, results in distress, even apart from the awful implication which will be discussed later.

The court sees that there has been a reconsideration and reversal of the inter-

pretation first placed on the statute's provision by the administrator and adhered to for, apparently, four years out of its presently less than seven years of age. How the court obtained this vision is not stated. Conceivably some suggestion might have been made as a hypothesis in a brief or oral argument that the administrator had changed his mind. Just as likely is it that the court has resorted to pure speculation and had read into his acts a rationale and an intent it is willing to favor. The suspicion generated by the history of earlier less-than-precise compliance with the timetable for the schedules that there was merely a case of neglect need not be elevated to theory. It may be accepted that the administrator changed his mind consciously and deliberately.

In the court's statement, what exactly is the interpretation of the administrator which the court has approved? The language of the footnote is ambiguous at the very best.

In the first sentence it is said that the administrator had effected "republications" according to a then perceived mandate of the statute. The first clause of the second sentence says that he then reversed his determination that "they" were necessary. "They" can, at this point, mean only, and unqualifiedly, "republications." The approved proposition then is "Republications of the schedules are not necessary." This is, *mirabile dictu,* precisely the holding of the district court in the "Andrews" case!

It is true that the court adds to its second sentence, " . . . he decided to cease republication in the Federal Register."

All of this most broadly viewed, in light of what the court specified to be its "holding," can ultimately mean any one of three things:

(1) the statute does not require the administrator to republish the schedules;

(2) the statute requires the administrator to republish the schedules, with a variety of means at hand for the republication, one of which, the use of The Federal Register, is not a *sine*

*qua non,* and another of which, reprinting in the CFR, is acceptable but, again, not a *sine qua non* nor even an exclusive alternative; or,

(3) the republication required by the statute must be either in the form of republication in the Federal Register or in the reprinting of a volume of the CFR, with no other way acceptable.

My view of the first listed choice has been set forth in the "Wiles" case. The use of the CFR as the "exclusive alternative" I have also discussed there. The second possibility is, I now submit, impossible to live with. The court has set no standards by which the validity of a purported "republication" can be judged. The administrator is free to continue to play ducks and drakes with the requirement and the regulated public is relegated to a mere guessing game: "What will he think of next?" Conceivably, the administrator could post a notice on the inside of his office door and we would be left to await the judgment of a court to see whether this is what Congress meant.

To go back to the administrator's postulated change of mind, there is another uncomfortable implication in the court's ready acceptance of the *volte-face.* There is double irony here.

Administrators are fond of the weight given by the courts to an agency's longstanding interpretation of a statute undisturbed by a corrective action by the Congress. This is said to indicate strongly the intent and the true meaning of the legislator. Additionally, of course, the Congress has declared at 5 U.S.C. § 553 that an agency "shall . . . publish in the Federal Register . . . statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public . . ." Further still, in substantive matters at least, the public has been warned that when an agency has published an interpretative ruling the public is bound to compliance with the statute as interpreted (not as an unenlightened reader might seriously take it). What we see

countenanced here is an early and announced interpretation of 21 U.S.C. § 812(c), duly promulgated in the Federal Register, and then, some time probably in 1975, reversed by the administrator in utter secrecy without a hint of notice to the regulator until a court of appeals belatedly throws a lifeline to the regulator two years later.

Literal compliance with the Act's requirement could have been achieved so easily and was avoided so unaccountably that the tendency of the court bodes ill for the established concepts of certainty and reasonability, as against whimsy and caprice, in the enforcement of criminal law.

The last chapter has not been written yet, even in the Ninth Circuit. The *Monroe* and *Andrews* cases were tried in the same Federal district not far apart in time. Both district court opinions were published in the same volume of the Federal Supplement. The court of appeals decided the *Monroe* case appeal on 23 February 1977, albeit with some deficiencies in attempted rationale previously discussed. As of this writing, more than four months later, the *Andrews* case, also on appeal, has still not been decided in that court. Three possibilities appear as the likeliest dispositions:

(1) the conviction will be affirmed by a simple order;

(2) the conviction will be affirmed *per curiam* with cryptic reference to the *Eddy* and *Monroe* "precedents;"

(3) a reasoned explanation may be attempted *de novo*.

Either of the first two actions will do nothing to clarify the law even in the Ninth Circuit. The third course, if it seriously treats the past and still latent problems, would be instructive, especially if administrators are directed to deal fairly and directly with the public and to do in the best way possible what Congress simply directs that they do without shortcuts and evasions.

I must add here one final observation. A red herring has conspicuously crossed the trail of truth here and in pursuing it the courts have gone up a garden path to encounter an easily demolished straw man. To find that the notice and hearing requirements for amendment of the schedules of controlled substances do not apply to the republication provisions does not, of itself, establish that republication in the Federal Register is not essential. I conclude again that an intrinsically accidental reprinting of a volume of the CFR is not a "republication" as mandated by the statute, and that the mechanical but discretionary act of the committee charged with its publication and printing is not the act, ordered by Congress, of the duly designated administrator of the Comprehensive Drug Abuse Prevention and Control Act of 1970.