**UNITED STATES**

v.

**Kenny L. COURTS, Seaman, U. S. Coast Guard.**

**CGCM 9949.**
**Docket No. 809.**

U. S. Coast Guard Court of
Military Review.

27 Sept. 1977.

Trial Counsel: LCDR Karl W. Mirmak, USCG.

Defense Counsel: LT Lane I. McClelland, USCGR.

Appellate Defense Counsel: LT Patricia L. Shebest, USCGR.

For the United States: LT George S. Karavitis, USCGR.

## OPINION OF THE COURT

ROSENWASSER, Chief Judge:

The accused, a member of the crew of the CGC GLACIER during its 1976 deployment, allegedly committed four offenses relating to transactions with cocaine. Tried by a general court-martial consisting of the military judge alone, he was found not guilty of all but one. The specification on which he was convicted set forth that he did

> at or near Lima, Peru, on or about 22 March 1976 violate a lawful general regulation, to wit: Paragraph 9–2–15A, CG Regulations, dated 7 February 1975, by having in his possession cocaine, a controlled substance.

The judge sentenced him to a bad conduct discharge, confinement at hard labor for three months, and reduction to pay grade E–1, but recommended that the bad conduct discharge be suspended for ten months. On 27 December 1976 the convening authority approved the sentence and suspended the bad conduct discharge as recommended.

Four errors have been assigned, three of them with regard to the evidence before the findings and the fourth with regard to the failure to permit the attendance of a requested witness in mitigation. We do not find substantial merit in any of the assignments, and affirm the conviction and the sentence.

The admission in evidence of a laboratory report (Prosecution Exhibit 10) and the testimony of Lawrence Buer, a forensic chemist, is claimed as the first error. The evidence showed that a substance surrendered aboard ship by Mark J. Whipple, the key prosecution witness, was cocaine. The evidence was admitted, not to show that something possessed by the accused, Kenny Courts, was cocaine, but solely for the limited purpose of showing "that the witness Whipple had some expertise and ability to tell cocaine." The objection to the evidence is on the ground that a proper chain of custody was not established.

Since this court finds that the evidence in the record apart from Prosecution Exhibit 10 and Mr. Buer's testimony establishes that the accused possessed cocaine beyond a reasonable doubt, the assignment, even if correct, would be only harmless error.

■ We hold, nevertheless, that the questioned evidence was properly allowed. The government is not obliged to establish a chain of custody that is positively and indisputably perfect. It is enough that the evidence here shows a strong probability that what Whipple turned in aboard the GLACIER on the last Saturday in March was analyzed in the lab by Mr. Buer and reported on in Prosecution Exhibit 10 dated 16 April. See *United States v. Martinez*, 43 C.M.R. 434 (A.C.M.R.1970). The asserted defects [1] in the chain of custody affected the weight of the evidence, but not its admissibility.

The second assignment of error attacks the reception in evidence (without objection at the trial) of opinion testimony from Whipple referring to a substance which he and the accused purchased from one "Ed" in Callao, Peru, as cocaine. It is said that the prosecution failed to establish Whipple's expertise in cocaine identification.

■ However, the testimony shows that Whipple was a cocaine user; that he knew how to administer it, what it looked like, and where and how to buy it as well as how to cut or dilute it; and he described his physiological reactions to it. Moreover, he testified that he sampled the cocaine obtained from "Ed" at Ed's house when he and the accused purchased it. The testimony was enough to allow the witness to characterize the substance as cocaine. See *United States v. Jackson*, 49 C.M.R. 881 (A.F.C.M.R.1975); *United States v. Torrence*, 3 M.J. 804 (C.G.C.M.R.1977); *United States v. Jones*, 20 C.M.R. 438 (A.B.R.1955); DA Pam. 27–22, Mil.Crim.Law—Evidence, Ch. 12, para. 1 (1975).

The third assignment of error reads: EVEN IF WHIPPLE'S OPINION TESTIMONY, THE LAB REPORT AND BUER'S TESTIMONY, WERE PROPERLY ADMITTED, THE EVIDENCE FAILS TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE DEFENDANT POSSESSED COCAINE.

■ The court's finding that the accused possessed cocaine as alleged rested on Whipple's testimony. Whipple was an accomplice; he was a drug user; he testified under a grant of testimonial immunity. All these circumstances bear upon his credibility, and we have considered his testimony with the utmost caution. Yet the testimony was competent; it was admissible; only the weight to be given it is open to question. Appellant argues that "Whipple's testimony is simply too uncertain and too vague to permit a conclusion that the substance possessed by the defendant was cocaine". But we do not find it so.

Whipple's uncontradicted testimony shows that he and Kenny Courts, the accused, conversed at least twice aboard ship

1. Three defects were alleged:
 A. CWO Hampton received the material from Whipple and delivered it to CDR Coste, the executive officer, on 27 March. LCDR Hamilton obtained it from CDR Coste on 9 April and transferred it the same date to C. E. Loveless, an agent of the Drug Enforcement Administration. There is no evidence as to what CDR Coste did with it between 27 March and 9 April.
 B. The lab report indicated that the material which came to it from the GLACIER was: "Plastic bags containing a strip of white surgical tape and the initials C.E.L. and dated of 4–5–76." CEL is C. E. Loveless. There is no explanation in the record for the date discrepancy.
 C. The record shows that Whipple surrendered the presumed cocaine to CWO Hampton in 6 plastic bags and a wax paper packet, and that LCDR Hamilton transferred the same to Agent Loveless. But the lab report and Buer show that the lab analyzed not only 6 plastic bags and a wax paper packet, but also the contents of two other plastic bags and a small plastic vial. However everything analyzed turned out to be cocaine; and under "Remarks", the lab report referred to the whole as "The suspected cocaine seized aboard the CGC GLACIER".

We have no difficulty in concluding from the evidence that Whipple's six bags and one wax paper packet were included in the lot tested in the lab and ascertained to be cocaine.

about buying cocaine. He pinpointed one conversation in the ship's laundry prior to the arrival at Callao, and another when in port in Callao, on the fantail. It was Kenny Courts who introduced "Ed" to Whipple—on 22 March 1976 just outside the main gate. He testified that, much later on the same date he went with Courts by taxi to Ed's house in Callao. At Ed's house he transferred $2600 in cash—money belonging to other named Coast Guard persons—to Ed, and received for that sum between 260 and 280 grams of cocaine. At the same time and place, Courts paid Ed between $400 and $500, for which Ed delivered approximately 50 grams of cocaine. Whipple stated: "We counted out the money, gave it to Ed, and took possession of our cocaine." He was "not really certain if it was one bag or two bags." He was asked:

Was every bit of the cocaine that was delivered to (sic) Ed's to the two of you taken into possession by one or the other or both of you?"

He replied:

Both of us.

After receiving the cocaine, according to the uncontradicted testimony, he and Courts remained at Ed's house, took the cocaine out of the bag or bags, and proceeded to cut it and repackage it in smaller quantities. Ed sent a member of his family to buy the cutting agent in a pharmacy. Whipple stated that he thought Ed said it was .05 per cent boric acid. They weighed out the repackaged quantities on a small balance scale: "we measured out roughly 10 gram increments" then weighed it and "put it in separate packages."

Whipple thereafter testified with regard to their departure, as follows:

Q. Where did you go after you departed Ed's?

A. We went back to the base there were (sic) the ship was.

Q. How did you get there?

A. By taxi cab.

Q. Do you remember what time you arrived at the ship?

A. I believe it was somewhere in the neighborhood of about 8:30 in the evening, 2030.

Q. Did you have cocaine on your person at that time?

A. Yes.

Q. Did COURTS?

A. I assume he did, yes.

Q. Why do you assume that he did?

A. Well, he wouldn't have left it at Ed's house, I don't think.

 It may be noted that one who assists others in weighing and packaging a drug has possession of the drug. See *United States v. Quesada*, 512 F.2d 1043, 1045 (CA 5, 1975). In addition of course, Whipple testified directly that the accused took possession of the substance. His testimony with regard to Courts possessing cocaine was not questioned on cross-examination: altogether he was asked no more than nine questions on cross-examination by defense counsel. That the substance was indeed cocaine, is established not simply by Whipple's referring to it as cocaine, but more importantly by the detailed circumstantial evidence. The identity of a controlled substance may be established by circumstantial evidence without the direct evidence of a laboratory analysis. *Agueci v. United States*, 310 F.2d 917 (CA 2, 1962) cert. den. 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed. 12 (1963); *United States v. Gregorio*, 497 F.2d 1253 (CA 4, 1974); *United States v. Quesada, supra*; *United States v. Torrence*, 3 M.J. 804 (C.G.C.M.R.1977).

Whipple's testimony, then, with regard to the essential facts was clear, consistent and certain; it was not questioned nor was it inherently improbable or incredible. As noted earlier, this court holds that the trial judge's finding that the accused possessed cocaine as alleged was correct in law and fact.

The final assignment of error is:
THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING THE DEFENSE REQUEST FOR A WITNESS IN MITIGATION.

 Three live witnesses plus the accused himself gave sworn testimony in miti-

gation for the defense. Two were commissioned officers from the CGC GLACIER; the third was a drug education specialist. However a written request by the accused for his sister, Mrs. White, as a witness in mitigation, was denied. The request for Mrs. White, who resided in Indianapolis, was submitted on the day the trial began and was supported by nothing more than the statement: "The witness is expected to testify to the good character of the defendant."

It was not until the following day, after the trial on the merits was concluded, that the defense counsel submitted a synopsis of Mrs. White's expected testimony. The synopsis stated that she would testify:

That she is the sister of Kenny Courts, that she brought him up until he was six years old, and continued in contact with him until the present; that he has always been quiet and a good guy and never any trouble; that he had a sheltered childhood; that he graduated from high school; that their mother died 3 years ago, whereupon he left his job at Link Belt and joined the Coast Guard; that he married his wife Patricia after joining the Coast Guard; that he seems very good to her and the child is crazy about him; that he came home to see his family in June and at that time his sister went into the hospital for surgery and the whole family was very upset about this.

After examining the synopsis, and hearing counsel, the judge denied the request, at the same time enjoining the trial counsel "to carry out a liberal policy" with regard to stipulating to the witness' testimony.

Subsequently the judge accepted, with the consent of the trial counsel, Defense Exhibit A, a stipulation of the testimony of Mrs. White, which was exactly the same, word for word, as the synopsis first presented. Still later the accused himself testified. He explained the circumstances of the AWOL committed by him in June (after the current offense) when he overstayed his leave by 11 days. He also told the court that he was married and had a three-year old son; that he had four sisters and the family was very close; that while he was home on leave his sister was due to have surgery and he wanted to make sure everything was OK; that he liked the Coast Guard, but not the hassles he was going through, and that he had given some thought to extending or reenlisting.

The Court of Military Appeals, in its most recent opinion concerning the right of an accused to the live presence of witnesses in his behalf, said:

. . . if the testimony of a given witness is material, the live presence of that witness must be furnished or the proceedings abated[2] . . . unless, in the sound discretion of the trial judge, the testimony of that witness would be merely cumulative to the testimony of other defense witnesses.

—*United States v. Williams*, 3 M.J. 239 (C.M.A.1977) per Perry, J.

In the *Williams* case the court quoted the rule first enunciated in *United States v. Carpenter* (*infra*, footnote 2):

[O]nce materiality has been shown the Government must either produce the witness or abate the proceedings.

Judge Cook, who authored the *Carpenter* opinion, dissented in *Williams* and also dissented in *United States v. Willis* (*infra*, footnote 2) which applied the rule to witnesses requested solely in mitigation.

Nevertheless the rule currently represents the law in court-martial cases. Accordingly we inquire whether Mrs. White was a material witness. And that leads us to ask: What do we mean by "material"? What kind of testimony is "material" in a sentence proceeding? As defined by Larkin and Munster, in *Military Evidence* (1959), p. 81:

. . . evidence is material when, having probative value, it tends to induce persuasion, either pro or con, as to any issue which is properly before the court.

**2.** Citing: *United States v. Willis*, 3 M.J. 94 (C.M.A.1977) and *United States v. Carpenter*, 1 M.J. 384 (1976).

The 1951 Manual for Courts-Martial also defined "material" evidence, but the definition was omitted from the 1969 Manual. The Analysis of Contents, MCM 1969 (DA Pam. 27–2) explained:

> . . . the distinction between "material" and "relevant" evidence found in the third paragraph of 137 in the former Manual was dropped. This distinction was confusing and served no useful purpose. The words are consistently used interchangeably and any supposed distinction is merely academic.

So, instead of defining "material" evidence, the Manual now provides in paragraph 137:

> Evidence is not relevant, as that term is used in this manual, when the fact which it tends to prove is not part of any issue in the case. Also, evidence is not relevant when, though the fact intended to be proved thereby is part of an issue in the case, the evidence itself is too remote to have any appreciable probative value for that purpose. As used in this manual, . . . "material evidence" has the same meaning as "relevant evidence."

Examining Mrs. White's testimony in the light of the foregoing, the evidence which she gave was, in the words of the 1969 Manual, "too remote to have any appreciable probative value." The issue in the sentence part of the case was, as in all sentence proceedings: what punishment is appropriate under the facts and circumstances of this particular case?

■ One kind of evidence that, in general, is relevant in mitigation is "evidence of good soldierly character". *United States v. Carpenter, supra.* Also, testimony that the accused is unlikely to repeat the offense, may be "material." See *United States v. Barfield,* 22 U.S.C.M.A. 321, 46 C.M.R. 321 (1973). Evidence that the accused is of borderline mentality is "material." See *United States v. Macreading,* 20 C.M.R. 560 (C.G.B.R.1955). Any evidence with respect to the mental condition of the accused which falls short of creating a reasonable doubt as to his sanity, may be considered on the sentence. Para. 123, MCM, 1969; *United States v. Block,* 18 C.M.R. 458 (C.G.B.R.1955). In the instant case, however, the testimony of Mrs. White could have, at best, only minimal value toward assisting the court in determining the kind and amount of punishment to impose. The rules of evidence are relaxed in the sentence part of the case and an accused is privileged to have his mother, or grandmother or sister or other relative, friend or acquaintance come in and testify, but unless the testimony of such witnesses has appreciable probative value toward determining the appropriate sentence, the government need not stand the expense of having these witnesses appear.

But even assuming that Mrs. White's testimony was not too remote to be considered "material", her testimony was cumulative to that which the accused himself was able to supply. The accused was able to, and did, testify as to his family relationships; and he was surely the person best able to explain the extenuating circumstances connected with his pretrial AWOL.

■ Further, as has been noted, the application for this witness was not properly submitted until midway in the trial. In effect, the application became a motion for a continuance. It was not an abuse of discretion, under the facts here, for the judge to refuse to interrupt the trial at this point. An application for a witness may correctly be denied if it comes inexcusably late. *Pouncey v. United States,* 121 App. D.C. 264, 349 F.2d 699 (1965).

■ Finally, since the bad conduct discharge was suspended, if there was error it would not be deemed prejudicial. *United States v. Manos,* 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967).

The finding of guilty and the sentence as mitigated are affirmed.

Judges BURGESS and ALCANTARA concur.

Judge LYNCH concurs in part and dissents in part. See separate opinion which follows.

Judge MAGUIRE did not participate in the decision in this case.

LYNCH, Judge, concurring in part, dissenting in part:

I concur with the majority's conclusion that the finding of guilty is correct in law and fact and should be affirmed.

I strongly disagree with the reasons given by the majority for affirming the sentence, and dissent. I would set aside the sentence and authorize a rehearing. The Opinion of the Court correctly stated the law with respect to the test to be applied in determining when a live witness must be produced (*U. S. v. Williams, supra*), however the Court draws three erroneous conclusions: first that the testimony of the defendant's sister was not material or of any probative value; second, that her testimony, even if material, was cumulative; and thirdly, that the military judge did not abuse his discretion in denying the request for the personal appearance of the sister, since application for the witness was not made in a timely fashion but rather "midway in the trial." I will treat each of these conclusions separately.

## I

To determine what matter is relevant, what matter has probative value, and what matter serves to substantially assist a court in determining an appropriate sentence, an understanding of the function and purpose of sentencing is essential. To imply, as does the majority, that only those matters pertaining to a defendant subsequent to his entry into the service are relevant, and that his pre-service background is too remote to have any probative value, is to either ignore or misunderstand the sentencing function.

The Court of Military Appeals has, on many occasions, referred to and adopted various portions of the ABA Standards for Criminal Justice,[1] insofar as they could be incorporated into the military justice system.

The ABA Standards Relating to Sentencing Alternatives and Procedures and the Standards Relating to Probation provide excellent insight into the sentencing function and what matters should be considered in determining an appropriate sentence.

As stated in the introduction to the former

The decision which is presented at sentencing is also enormously complex. It properly is concerned, and often predominately, with the future which can be predicted for the particular offender. But any single-valued approach to sentencing is misdirected.

\* \* \* \* \* \*

Part IV consists of recommendations concerning certain informational facilities which ought to be available to the court as an aid in sentencing. It is based on the premise that it is the rare case where enough can be learned from the trial itself, let alone a guilty-plea proceeding, to satisfy the needs of an informed sentencing decision.

\* \* \* \* \* \*

There is great need for information as the base for a proper sentence. The main vehicle for providing the needed information to the court is and ought to be the presentence investigation and report. . . . Presumptively it should be used in every case where incarceration for a year or more is a possibility, where the defendant is youthful, or where he is a first offender.

The military justice system, at the present time, makes no provision for a presentence investigation similar to that in most civilian jurisdictions. This means, therefore, that in order for an informed decision to be made on sentencing, the de-

---

1. *United States v. Pringle*, 3 M.J. 308 (C.M.A. 1977) ABA Standards for Joinder and Severance; *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977) ABA Standards for Defense Function and ABA Standards, Function of Trial Judge; *United States v. Larneard*, 3 M.J. 76 (C.M.A. 1977) ABA Code of Professional Responsibility and ABA Standards, Criminal Appeals; *United States v. Heard*, 3 M.J. 14 (C.M.A.1977) ABA Standards for Pretrial Release; *United States v. Knickerbocker*, 25 U.S.C.M.A. 346, 54 C.M.R. 1072 (Interim) ABA Standard, The Prosecution Function; and *United States v. Barfield*, 25 U.S.C.M.A. 212, 54 C.M.R. 539, 2 M.J. 136 (Interim) ABA Standard Relating to Plea of Guilty.

fense counsel must present, and the military judge obtain, such information during the presentencing portion of the trial—extenuation and mitigation. The question then becomes what information is considered "relevant" under the ABA Standards with respect to the sentencing function.

In the commentary to Section 4.1 relating to the sentencing function, entitled "Presentence report: General Principles" it is stated:

"It is basic to any intelligent decision that it be sufficiently informed by fact. Yet this fundamental proposition has often been forgotten when sentencing is the issue. There is practically uniform agreement that the adversary model, which so clearly dominates the issue of guilt, is not appropriate as the dominant element in the proceedings leading to a sentence. It is clear, however, that not enough attention has been directed to what should take its place. . . . (T)here are two predominant values which the adversary system serves at the guilt stage which must be preserved at sentencing: the first is that the system cannot function in a consistent and a rational manner unless methods are devised to provide it with complete and reliable information about the defendant. . . . This section deals with the first of these principles. It is based on the view that the presentence report has proven to be a thorough and efficient method of compiling most of the information which is essential to an informed sentencing decision."

Standard 2.2 relating to Probation sets forth the purpose of a presentence report and makes clear that the information contained therein "assists the court in determining the appropriate type of sentence." Standard 2.3 relating to Probation deals with the content and scope of a presentence report, and therefore provides some explicit guidelines concerning what information should be considered by a court in determining an appropriate sentence. Among those factors enumerated are:

(C) a description of the educational background of the offender;

(D) a description of the employment background of the offender, including any military record and including his present employment status and capabilities;

(E) the social history of the offender, including family relationships, marital status, interests and activities, residence history, and religious affiliations; and

(G) information about environments to which the offender might return or to which he could be sent should probation be granted.

It is noted, in the commentary to this Standard, that "The kind of family situation and community environment to which the offender may return if he is placed on probation are of obvious and central importance in the establishment of a program which is to have rehabilitative significance."

It is clear from the foregoing, that information concerning a defendant's pre-service background—educational, employment, social, and family—are not only relevant but essential to a proper disposition of the case in terms of what an appropriate sentence would be.

In this case we are faced with a 23-year old defendant with two years service in the Coast Guard. To say, as did the majority, that the testimony of the defendant's sister concerning his educational, employment, and family background for the 21 years of his life prior to entering the service is "too remote to have any appreciable probative value" is, in my opinion, patently wrong.

II

The majority holds that even if the testimony of the defendant's sister was material, it was cumulative in view of the fact that the defendant testified concerning his pre-service background. I cannot accept this "hindsight view" of the trial events. This court must decide the correctness of the military judge's refusal to compel the attendance of the defendant's sister as a witness in the light of the evidence and

circumstances before him at the time of his decision. Clearly, a defendant's rights during the presentencing portion of a trial include the right to present evidence, the right to testify, the right to make an unsworn statement, and the right to remain silent. At the time the military judge refused to compel the attendance of the defendant's sister there was no indication whatsoever as to which, if any, of the defendant's rights he intended to elect other than the right to call witnesses in his own behalf. To say now that the defendant's testimony, after having been denied that of his sister, justifies a conclusion that the sister's testimony would have been cumulative, is to deny the defendant his right to remain silent. In this case it can be inferred that the defendant's election to testify concerning his pre-service background was compelled in that he was denied his sister's, and the only way in which he could put this information before the court was to testify himself.

It is of particular interest to note that the military judge's denial of the witness request was solely on the basis that there was nothing to which the sister would testify "that would be particularly crucial or compelling for the defendant to warrant any necessity to have this particular witness appear in person." (R. 72). It was the trial counsel, in resisting the production of the sister, that stated "there are substitutions which I think are adequate for the testimony of this witness including the . . . testimony of the defendant himself, sworn or unsworn." (R. 71)

It is my opinion, therefore, that the trial record does not support the majority's determination that no error was committed by the military judge since the proposed testimony of the defendant's sister was cumulative.

### III

The majority has relied upon the issue of lack of timeliness to support the ruling of the military judge. As noted above, the sole basis for the military judge's refusal to compel the attendance of the defense witness requested was the lack of a compelling need. No mention was made by the military judge of any concern over the timing of the request. Therefore, as with the issue in II above, the majority have seized upon a basis for the ruling that the military judge did not rely upon.

The record reflects that the order convening this general court-martial was signed on Friday, 9 July 1976 and on the same day charges were referred and served on the defendant. The trial convened some six days later, the following Thursday, 15 July 1976. Early on the morning of 15 July, prior to the convening of the court, the defense counsel served upon the trial counsel a request for the defendant's sister stating that she would "testify to the good character of the defendant." Early during the Article 39(a) session, the defense presented to the military judge the request for the defendant's sister. The following dialogue is found on pages 7 and 8 of the record:

MJ: Has appropriate action been taken with respect to the request for a witness:

TC: No, Your Honor, I received this request shortly before we came into court. I feel in the absence of any strong showing on the part of the defendant that this witness is material and necessary to the defense then I would deny the request.

DC: Your Honor, I think the defendant has a right to have witnesses appear in extenuation and mitigation rather than on the merits. I think he has a right to have this witness appear.

MJ: The difficulty I can see at this time is at this stage we are not certain we will require extenuation and mitigation witnesses. But if that contingency should arise . . . is this the only witness the defense is requesting in this regard?

DC: Your Honor, the defense has requested two people from the unit here in town as well.

MJ: This is the only request for a witness from any place other than this area for extenuation and mitigation?

DC: Yes, Your Honor.

MJ: Considering the seriousness of a general court-martial and this being a request for . . . I would say a modest request for a witness, I would find it prejudicial to the defendant to fail to act on such a request. Unless counsel can present clear and cogent reasons why the request should not be granted.

Decision on the defense request was apparently deferred until later in the trial, should there be a presentencing stage. The defense request was renewed following the defendant's conviction, prior to the presentation of the defense case in extenuation and mitigation. At that time Defense Exhibit A was presented to the military judge which contained a fairly detailed synopsis of the expected testimony of the defendant's sister which clearly established that she would provide the court with the defendant's pre-service background.

The majority opinion holds that this was in effect, an application for a continuance and that it was not an abuse of discretion for the judge to refuse to interrupt the trial at this point. The Court of Military Appeals in *United States v. Barfield*, 22 U.S.C.M.A. 321, 46 C.M.R. 321 (1973) stated:

An accused is entitled to the attendance of witnesses in his attempt to extenuate his offense and to mitigate his punishment. (Citations omitted) Denial of a continuance to obtain the attendance of a witness in the presentencing proceedings may be prejudicial.

In *Barfield*, as in the present case, the application for a continuance to obtain the requested witness came following conviction and prior to the defense case in extenuation and mitigation. The Court in *Barfield* concluded that the military judge

erred in denying the motion for a continuance to obtain the requested witness.

It is my opinion, therefore, that under the facts of this case, timely notice was provided to the government, and timely application was made to the military judge concerning the live testimony of the defendant's sister. The majority's support of the military judge's decision on the basis of the untimeliness of the application is without foundation. Even if the issue be treated as one concerning an application for continuance, which I do not believe to be the case, because of the importance and materiality of this testimony, it is my opinion that it would have been an abuse of discretion to refuse the continuance. *United States v. Barfield, supra.*

In summary, it is my opinion that the information sought to be presented to the court pertaining to the pre-service background of the defendant was relevant, material, and of substantial probative value in assisting the court in determining an appropriate sentence. I do not believe that the defendant's testimony, after being denied his sister as a vehicle for presenting it to the court, may be utilized to conclude that the sister's testimony would have been merely cumulative. The military judge's initial evaluation of the defendant's request quoted above was correct. He, however, allowed himself to be dissuaded by the arguments of trial counsel.

My opinion should not be read as standing for the proposition that a defendant has a right to have one member of his family as a live witness. There are many ways in which evidence of a defendant's pre-service background can be placed before the court. Many defense counsel present letters, affidavits, and other reliable statements from people who have known the defendant and his background, and in this way present the information to the Court (Para. 75c. MCM, 1969 (Rev.)). Some defense counsel, however, may choose to rely solely on the testimony or unsworn statement of the defendant himself. Still others may choose to seek a live witness to accomplish the pre-

sentation of information concerning the defendant's background. The method is the choice of the defense counsel. In this case, the defense counsel chose not to utilize letters and statements concerning the defendant's background but rather rely solely on the sister of the defendant as a live witness. Had the defense counsel presented several statements and letters concerning the defendant's background and also sought his sister to present the same information, a different decision on the question of cumulativeness might result.

In view of the above, as stated before, I would set aside the sentence and authorize a rehearing.