943 F.2d 55
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Howard HANDA, Defendant-Appellant.
 No. 90-10514.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 7, 1991.
Decided Sept. 9, 1991.
 
 Before SCHROEDER, FLETCHER and FERGUSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Howard Handa appeals his convictions for possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), and use of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). He asserts that the district court erred in denying his motion to suppress evidence, in instructing the jury that his gun was a "firearm" as a matter of law, in failing to instruct the jury on a standard of proof regarding the quantity of the drug, in finding that methamphetamine hydrochloride constituted "pure methamphetamine" under Sentencing Guideline Table 2D1.1, and in refusing to reduce the base offense level two points for acceptance of responsibility. Handa also argues that there was insufficient evidence to support the jury verdict that a firearm was "used" within the meaning 18 U.S.C. § 924(c)(1) and that he possessed with intent to distribute more than 100 grams of methamphetamine.
 
 
 3
 We affirm Handa's conviction and sentence.
 
 BACKGROUND
 
 4
 Howard Handa was arrested as he pulled up to his residence at 3:00 a.m. on January 5, 1990. DEA and state drug enforcement agents had staked out his residence in order to execute a search warrant. They also planned to arrest Handa for participating in methamphetamine transactions in October and December, 1989. (The earlier transactions are not at issue in this case.) Handa concedes that the agents had probable cause to arrest him and that the warrantless arrest therefore was valid. After Handa was removed from the car and handcuffed, the agents searched the interior of the car and seized from the front passenger seat a green men's purse which they opened, revealing the gun and another closed container with the methamphetamine--the two items at issue in the present case. Handa asserts that the warrantless search of the interior of his vehicle exceeded the scope of a search incident to arrest. His motion to suppress the seized evidence on that basis was denied by the district court below.
 
 
 5
 The gun recovered from the purse, a Raven .25 caliber semi-automatic pistol, was unloaded and had no magazine. There was no ammunition or magazine found in the purse, in the car, or on Handa's person. When Handa was questioned at the DEA office immediately following his arrest, he acknowledged ownership of the gun and drugs recovered from the car. Handa reaffirmed his ownership in a second, more detailed interview with state drug authorities. Handa was indicted by a grand jury on charges that he "knowingly and unlawfully possessed with intent to distribute a quantity of crystal methamphetamine in excess of 100 grams, to wit approximately 111 grams" in violation of 21 U.S.C. § 841(a)(1) and that he knowingly used a firearm "during and in relation to the drug trafficking crime of possession with intent to distribute crystal methamphetamine" in violation of 18 U.S.C. § 924(c)(1).
 
 
 6
 The jury returned a verdict of guilty on both counts and indicated on the special verdict form its finding that Count 1 involved 100 grams or more of methamphetamine. At sentencing, the district court found the base offense level to be 32 pursuant to U.S.S.G. § 2D1.1(c)(6), which specifies a base offense level of 32 where the offense involves "[a]t least 1 KG but less than 3 KG of Methamphetamine, or at least 100 G but less that 300 G of Pure Methamphetamine." In setting the base offense level at 32, the district court found that methamphetamine hydrochloride ("crystal meth") constituted "pure methamphetamine" within the meaning of the section.
 
 
 7
 Handa argued in the district court and argues on appeal that the base offense level should have been 30 rather than 32, which would have resulted in a sentencing range of 90-121 months rather than 121-151 months.[1] The government's witness at sentencing, Mr. Chan, testified that the methamphetamine hydrochloride had a purity of 98 percent (for the 111.57-gram packet) and 92 percent (for the 1.99-gram packet), yielding a total of 111.17 grams of pure crystal meth. Handa offered evidence, by way of a detailed offer of proof, that if the hydrochloride were separated from the methamphetamine, which he argued was required to obtain the "pure methamphetamine" figure specified in 2D1.1(c), the aggregate weight of methamphetamine alone would be 89.0 grams. The district court rejected Handa's argument and set the base offense level at 32.
 
 
 8
 Handa also sought and was denied a two-point downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. He asserted that he had never contested his factual guilt, but had gone to trial in order to litigate and preserve legal issues. The district court indicated that it denied the reduction not because Handa went to trial, but because, on his lawyer's advice, Handa refused even after conviction to speak to the probation department about the facts of the case, since he anticipated an appeal. Because of that refusal, the district court felt that it had no basis to evaluate what responsibility Handa accepted. Handa argues on appeal that he was entitled to the acceptance of responsibility adjustment based on the statements he made to the DEA agents, and that the denial of the adjustment penalized his valid assertion of his Fifth Amendment rights and constituted an abuse of discretion by the district court.
 
 DISCUSSION
 A. Fourth Amendment Claim
 
 9
 Handa challenges the district court's admission into evidence of the gun and methamphetamine seized from Handa's automobile immediately following his arrest. The denial of a motion to suppress is generally reviewed de novo. United States v. Thomas, 844 F.2d 678, 680 (9th Cir.1988). The government must prove the existence of an exception to the Fourth Amendment by a preponderance of the evidence. United States v. Vasey, 834 F.2d 782, 785 (9th Cir.1987). The ultimate issue of the lawfulness of search presents a mixed question of law and fact which we review de novo. Id.
 
 
 10
 We conclude that seizure of the green purse from the front seat of the vehicle, and examination of its contents, including opening the smaller container inside the purse, was within the permissible scope of a search incident to arrest under New York v. Belton, 453 U.S. 454 (1981). In Belton, the Supreme Court refined the "search incident to arrest" rule set out in Chimel v. California, 395 U.S. 752 (1969) (permitting contemporaneous search of the area within the "immediate control" of the arrestee) to deal with the specific problem of automobile searches incident to arrest. The Court held in Belton that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile ... [and] any containers found within the passenger compartment...." 453 U.S. at 460.
 
 
 11
 Handa argues that the present case is distinguishable from Belton because the officers' probable cause to arrest, based on the October and December drug transactions, did not arise contemporaneous with the search. That is, the probable cause to arrest Handa did not arise from Handa's actions immediately preceding his occupancy of the vehicle, his actions in driving the vehicle, or from anything which the officers noticed inside the vehicle. Handa also argues that the Belton rule should not apply because there was no real concern for the personal safety of the agents participating in the arrest since Handa had already been handcuffed at the time of the search. Neither of these arguments has merit.
 
 
 12
 Handa cites no authority for his argument that there must be some nexus between the probable cause to effect the arrest and the search of the vehicle. While there are no Ninth Circuit cases which squarely address that question, it is clear that Belton has not been applied in such a limited manner. See, e.g., United States v. Wiga, 662 F.2d 1325 (9th Cir.1981) (applying Belton to the search of a motor home where probable cause to arrest the driver as a federal parole violator arose prior to and entirely separate from any conduct involving the vehicle), cert. denied, 456 U.S. 918 (1982); United States v. Abel, 707 F.2d 1013 (9th Cir.1983), rev'd on other grounds, 469 U.S. 45 (1984) (upholding contemporaneous search of the passenger compartment of a truck arrestee had recently exited where probable cause for the arrest was unrelated to the vehicle except for assisting in identification). The "nexus" theory also fails as an analytical matter since the Belton exception to the warrant requirement derives not from any notion that there is probable cause or reasonable suspicion to search the vehicle, but from an extension of Chimel, which focuses on the need to search an arrestee's "grabbable area" so as to protect the safety of the officers and to preserve any evidence from destruction. The safety and evidence preservation rationales are implicated whether the probable cause to arrest arises contemporaneously with the arrest or whether it has arisen at some earlier point.
 
 
 13
 Likewise unavailing is Handa's argument that the search was invalid because there was no "real danger" to the officers since he was already removed from the vehicle and handcuffed at the time of the search. Belton's bright line rule, while based on a safety rationale, does not require a case-by-case examination of whether safety was actually an issue. See United States v. Lorenzo, 867 F.2d 561, 562 (9th Cir.1989) (per curiam ) (holding that where the search of the automobile is contemporaneous with the arrest as required by Belton, Chimel's test as to the "actual grabbable area" does not apply). Indeed, since Belton usually applies to searches made after the suspect has been arrested, the suspect normally will have been handcuffed and removed from the vehicle. In Belton itself, the four suspects had been removed from the vehicle, patted down and separated from one another. A number of Ninth Circuit cases which have applied Belton to uphold searches of automobile passenger compartments contemporaneous with arrest expressly indicate that the suspect was handcuffed at the time of the search. See, e.g., United States v. Howard, 758 F.2d 1318 (9th Cir.1985) (per curiam ) (car searched after suspect, who was the car's only occupant, was ordered out of the car and handcuffed); Abel, 707 F.2d at 1014 (search followed suspect's arrest outside of vehicle as he walked toward the house). There is no dispute that the search of the passenger compartment of Handa's car was essentially contemporaneous with his arrest. The seizure of the purse from the front seat and the examination of its contents were therefore permissible under Belton.
 
 
 14
 B. Sufficiency of evidence to support firearms conviction
 
 
 15
 Handa challenges the sufficiency of the evidence supporting his firearms conviction. We must sustain a conviction against a sufficiency of the evidence challenge if any reasonable juror, viewing the evidence in the light most favorable to the government, could find all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Savinovich, 845 F.2d 834, 837 (9th Cir.), cert. denied, 488 U.S. 943 (1988). Section 924(c)(1), the firearms statute under which Handa was convicted, provides in relevant part:
 
 
 16
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall ... be sentenced to imprisonment for five years ...
 
 
 17
 18 U.S.C. § 924(c)(1). Count Two of the indictment charged Handa with "use" of a firearm in relation to the drug trafficking offense charged in Count One. The question presented is whether Handa's possession of a gun in the same small purse with the drugs constitutes "use" of a firearm in relation to the offense of possessing those drugs with intent to distribute them. It was undisputed at trial that the gun was unloaded and had no magazine, and that there was no ammunition in the purse or car. The government presented no evidence that Handa actively used, displayed or brandished the gun in connection with his purchase of the drugs, or even that Handa took the purse (and gun) into the seller's house.
 
 
 18
 In United States v. Stewart, 779 F.2d 538, 540 (9th Cir.1985), this circuit held that the language of § 924(c) "necessarily implies some relation or connection between the underlying criminal act and the use or possession of the firearm." We have recognized, however, that there are some circumstances in which mere possession of a gun can constitute use under § 924(c). United States v. Torres-Rodriguez, 930 F.2d 1375, 1385 (9th Cir.1991); United States v. Moore, 580 F.2d 360, 362 (9th Cir.), cert. denied, 439 U.S. 970 (1978). Where possession of the firearm "facilitate[s] or has a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such a display or discharge in fact occurred, then there is a violation of the statute." Stewart, 779 F.2d at 540.
 
 
 19
 In the drug-trafficking context, this circuit has held that juries may infer that guns kept in proximity to drugs are possessed for offensive purposes. Torres-Rodriguez, 930 F.2d at 1385-86 (affirming conviction where police found a loaded .357 Magnum in defendant's bedroom between the mattress and spring of the bed, where residence also contained heroin, drug paraphernalia and large amounts of cash). We have affirmed jury verdicts in several cases where the connection between the firearm and the drugs or drug paraphernalia has been less clear than in the present case. See Torres-Rodriguez, supra; Stewart, 779 F.2d at 539 (affirming conviction where defendant was arrested in his car in front of his residence, car's trunk contained a sawed-off "UZI" rifle, and residence contained drug manufacturing equipment); United States v. Chase, 692 F.2d 69 (9th Cir.1982) (per curiam) (evidence that cocaine and pistol both found in residence sufficient to sustain § 924(c) conviction).
 
 
 20
 Handa cites United States v. Felix-Cordero, 859 F.2d 250, 254 (2d Cir.1988), in which the Second Circuit refused to presume "the intent to use the firearm ... from the fact that a loaded gun was found in the same room as drug paraphernalia," even in light of its "recognition of the frequent connection between firearms and narcotics." Given this circuit's holdings in Torres-Rodriguez and Chase, Felix-Cordera is simply not persuasive authority. While none of our proximity cases involved an unloaded or inoperable gun, as is the case here, other Ninth Circuit cases have recognized that the gun need not be operable in order to sustain a conviction under § 924(c). See section C, infra.[2] In light of our prior cases, Handa's challenge to the sufficiency of the evidence on the firearm charge must fail. A rational jury might infer that Handa was emboldened or protected in his criminal activity by his possession of even an unloaded gun in the same vicinity as his methamphetamine.
 
 
 21
 C. Court's instruction that gun was firearm as a matter of law
 
 
 22
 The district court, over Handa's objection, gave the Government's Proposed Instruction No. 23, which stated:
 
 
 23
 You are also instructed that a .25 caliber pistol, as described in Count Two of the Indictment is a firearm within the meaning of Title 18, United States Code, Section 924(c).
 
 
 24
 Handa argues on appeal that the issue of whether the gun was a "firearm" was in issue before the jury and that the instruction therefore violated his Sixth Amendment right to have the jury find all material elements of the charged offense.[3] Jury instructions are reviewed for abuse of discretion and are considered as a whole to determine whether they are misleading or inadequate. United States v. Armstrong, 898 F.2d 734, 739 (9th Cir.1990). Whether a jury instruction misstated elements of a statutory crime is a question of law to be reviewed de novo. Id.
 
 
 25
 The definitional section relating to 18 U.S.C. § 924(c) defines the term firearm to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). In United States v. Gonzalez, 800 F.2d 895, 899 (9th Cir.1986), this circuit affirmed a conviction under 18 U.S.C. § 924(c) for use of a firearm during a bank robbery where the defendant's gun was unloaded, holding that § 921(a)(3) "imposes no requirement that the gun be loaded or operable." See also, United States v. Harris, 792 F.2d 866, 868 (9th Cir.1986) (Section 921(a)(3) does not require a weapon to be operable). Where, as here, the weapon at issue clearly falls within the statutory definition of "firearm," there is no error in so instructing the jury. See Devitt and Blackmar, Federal Jury Practice and Instructions (1977 ed.), § 59.33.
 
 
 26
 D. Court's instruction as to quantity of methamphetamine
 
 
 27
 Handa also alleges instructional error in that neither the instruction setting out the elements of the drug offense nor the special verdict form specified the standard of proof by which the jury was required to find the quantity of methamphetamine involved. He therefore argues that the special verdict as to the quantity should be reversed. Although Handa objected to the first paragraph of the instruction on "Actual Amount of Drug to Be Proved" on other grounds, he did not object on the basis that the standard of proof was not specified. Nor was that a basis for his objection to the special verdict form. He likewise made no objection to the failure to include quantity as an element of the offense in the instruction setting out the elements of possession with intent to distribute. When there is no objection to the jury instructions at the time of trial, we review only for plain error. United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir.1989).
 
 
 28
 While Handa does not state what standard of proof he believes to be applicable, he asserts that the quantity of methamphetamine is an essential element of the crime, implying that it must be proven beyond a reasonable doubt. We have held, however, that "[s]ection 841(a) does not specify drug quantity as an element of the substantive offense of poessession with intent to distribute; quantity is instead relevant to the penalty provisions of section 841(b), and is a matter for the district court at sentencing." United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir.1991). A jury's verdict on the quantity of drugs is therefore advisory in nature. The district court in the present case did not treat it otherwise, as demonstrated by the fact that it held a post-conviction evidentiary hearing for sentencing purposes on the quantity and purity of the methamphetamine. Since quantity is not an element of the offense, and the district court did not treat as binding the jury's determination of quantity, the failure to specify a standard of proof for the quantity finding did not amount to plain error.
 
 
 29
 E. Sufficiency of evidence to support methamphetamine conviction
 
 
 30
 Handa argues that the evidence at trial was insufficient to support a finding that he possessed more than 100 grams of "methamphetamine." As discussed in section D, supra, quantity is not an element of the offense. For conviction there need only be sufficient evidence to support a finding that the defendant possessed a substance containing "some measurable amount of narcotic drug." Jordan v. United States, 416 F.2d 338, 344 (9th Cir.1969), cert. denied, 397 U.S. 920 (1970); see also United States v. Eddy, 549 F.2d 108, 111 (9th Cir.1976) (conviction of unlawful distribution of methamphetamine powder did not require evidence that powder seized contained sufficient quantity of drug to have measurable physiological effect). At trial, DEA Chemist Chan testified that the two packets seized from Handa "contained methamphetamine hydrochloride," commonly known as crystal methamphetamine, and that they weighed 111.57 and 1.99 grams. He did not testify at trial to the purity of the substance. Nevertheless, viewing the evidence in a light most favorable to the government, there certainly was sufficient evidence to support a conclusion that Handa possessed a "measurable amount" of methamphetamine with intent to distribute.
 
 
 31
 Handa makes much of the fact that the substance was crystal methamphetamine, and the indictment likewise alleged possession of crystal methamphetamine, while the jury was asked to determine the amount of "methamphetamine." There is, however, no meaningful difference between "methamphetamine" and "crystal methamphetamine" for purposes of 21 U.S.C. § 841(b)(1)(A)(viii), which treats methamphetamine, its salts, isomers and salts of its isomers as equivalent.
 
 
 32
 F. District court's finding that Handa possessed more than 100 grams of "pure methamphetamine" under Sentencing Guideline Table 2D1.1
 
 
 33
 Handa argues that his base offense level under the sentencing guidelines should have been 30 rather than 32 because crystal methamphetamine is not "pure methamphetamine" within the meaning of U.S.S.G. § 2D1.1(c)(6). Under § 2D1.1(c)(6), a base offense level of 32 is assigned where the offense involves "[a]t least 1 KG but less than 3 KG of Methamphetamine, or at least 100 G but less than 300 G of Pure Methamphetamine." In assigning a base offense level of 32, the district judge held that methamphetamine hydrochloride constituted "pure methamphetamine" within the meaning of the statute. Handa made an offer of proof at the sentencing hearing that if the weight of the hydrochloride were subtracted, the aggregate weight of "pure methamphetamine" would be less than 100 grams. The government does not contest that point, but argues that crystal methamphetamine is pure methamphetamine and that the hydrochloride therefore need not be subtracted. The evidence is clear that Handa possessed more than 100 grams of methamphetamine hydrochloride.
 
 
 34
 Application Note 5 to § 2D1.1 defeats Handa's argument. Note 5 provides, parallel with 21 U.S.C. § 841(b)(1)(A)(viii), that "[a]ny reference to a particular controlled substance in these guidelines includes all salts, isomers, and all salts of isomers." (emphasis added) Thus, where § 2D1.1 refers to "pure methamphetamine," it plainly includes pure "salts, isomers, and salts of isomers" of methamphetamine.[4] Since methamphetamine hydrochloride is such a salt, and since--after taking into account that the packets were only 92% and 98% pure--there was well over 100 grams of pure methamphetamine hydrochloride, the district court's application of the base offense level of 32 was correct.
 
 
 35
 G. Denial of acceptance of responsibility reduction
 
 
 36
 A sentencing court's determination as to whether a defendant has accepted responsibility is reviewed under a clearly erroneous standard. United States v. Gonzalez, 897 F.2d 1018, 1019 (9th Cir.1990). The determination by the district court is entitled to great deference. United States v. Smith, 905 F.2d 1296 (9th Cir.1990). Handa asserts that because he acknowledged his ownership of the drugs and gun, and because he provided information leading to the arrest of the source of the drugs (who then testified against Handa at trial), he was entitled to a two-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. He argues that denial of acceptance of responsibility points because he went to trial and because he refused to speak with the probation officer, penalizes his valid assertion of his Fifth Amendment right to remain silent and his right to trial.
 
 
 37
 Application Note 2 to § 3E1.1 provides in relevant part that
 
 
 38
 [the] adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).
 
 
 39
 Application Note 5 to § 3E1.1 states that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review."
 
 
 40
 In the present case, while Handa may have conceded his ownership of the gun and drugs, that concession was far from a full acknowledgement of factual guilt. At trial he contested the government's proof of the amount of drugs involved, the credibility of the government's witness, the evidence with respect to intent to distribute, and his "use" of the gun within the meaning of the statute. Because he refused to consult with the probation officer following his conviction, he never accepted responsibility for those critical aspects of the crimes.
 
 
 41
 Handa's constitutional arguments are simply too broad. Were we to accept them, there would be no practical way for a district court to evaluate acceptance of responsibility. The cases upon which Handa relies are distinguishable. In United States v. Perez-Franco, 873 F.2d 455, 457-58 (1st Cir.1989), the court reversed a district court's denial of the two-point adjustment for acceptance of responsibility because the defendant, who had pled guilty, would not disclose information related to the dismissed counts. In the present case, Handa is not being penalized for exercising constitutional rights; the district court simply found that Handa had not met his burden of showing acceptance of responsibility so as to entitle him to the downward adustment. This court has recognized that "... the reduction provided for in Section 3E1.1 is merely a benefit which may be accorded to a defendant if he is able to make the necessary showing. The possibility of leniency in the statute does not make denial of lenient treatment impermissible where the district court determines that the defendant has failed to exhibit the requisite contrition." United States v. Gonzalez, 897 F.2d at 1021 (holding that § 3E1.1 does not violate a defendant's right against self-incrimination). In this case, Handa failed to meet his burden of demonstrating acceptance of responsibility and the district court properly denied him the downward adjustment.
 
 
 42
 The conviction and sentence are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by the Ninth Circuit Rule 36-3
 
 
 [1]
 The district court sentenced Handa to 121 months on the drug offense, the bottom of the range. (Handa also received a mandatory consecutive term of 60 months on the firearms count.) As the district court pointed out at sentencing, what hangs in the balance is only one month since 21 U.S.C. § 841(b)(1)(A)(vii) provides for a mandatory minimum sentence of 10 years (120 months) for possession with intent to distribute "100 grams or more of methamphetamine, its salts, isomers, and salts of its isomers." The applicability of the section cannot seriously be contested in this case
 
 
 [2]
 Handa's citation to United States v. Phelps, 877 F.2d 28, 30 (9th Cir.1989), for the proposition that "mere presence of a firearm does not trigger the statute" is unavailing. In Phelps, the firearm clearly was present only as an item of barter for the drugs. The government's reliance on United States v. Heldberg, 907 F.2d 91 (9th Cir.1990) (unloaded handgun locked in briefcase in trunk of car) is likewise misplaced. Were Heldberg a § 924 case, it would dispose of Handa's claim. Heldberg, however, involved a sentencing guideline provision which provides an enhancement where "a dangerous weapon is possessed during commission of the offense." U.S.S.G. 2D1.1(b)(1) (emphasis supplied). There is no requirement under 2D1.1(b)(1) that the weapon be "used" in relation to the offense
 
 
 [3]
 In the court below, the defendant argued that the giving of this instruction was "essentially instructing [the jury] to find him guilty. It's like directing a verdict." That characterization was incorrect, however, since the critical question of whether Handa "used" the firearm remained within the province of the jury
 
 
 [4]
 Although we have never expressly recognized that methamphetamine hydrochloride constitutes "pure methamphetamine" within the plain meaning of § 2D1.1, we have implicitly addressed the same issue in the § 841(b) context and assumed that it does. Section 841(b) and § 2D1.1 use somewhat different language but effectively create the same distinctions between pure methamphetamine and methamphetamine in a mixture. They both also provide that references to a particular drug include its "salts, isomers, and salts of isomers." Section 841 distinguishes between methamphetamine and a "mixture or substance containing a detectable amount of methamphetamine," while § 2D1.1 distinguishes between "pure methamphetamine" and "methamphetamine." However, Note * to § 2D1.1 specifies that "the weight of a controlled substance ... refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance," thus rendering the two provisions essentially parallel (i.e., § 2D1.1's "pure methamphetamine" is equivalent to § 841(b)' § "methamphetamine" and § 2D1.1's "methamphetaime" is equivalent to § 841(b)'s "mixture or substance containing ... methamphetamine"). In United States v. Alfeche, No. 90-10568, slip op. filed Aug. 22, 1991 (following the First Circuit's decision in United States v. Stoner, 927 F.2d 45 (1st Cir.1991) and holding that the court may consider either the net amount of "pure" methamphetamine extracted from a mixture or the overall weight of the mixture in determining the applicable mandatory minimum sentence), we assumed without expressly deciding that methamphetamine hydrochloride was "methamphetamine" within the meaning of § 841(b)